IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JARED JACOBSON | : |
| | : |
| v. | : No. 22-cv-1464 |
| | : |
| CITY OF PHILADELPHIA | : |

**MEMORANDUM**

**SURRICK, J.**                                                                                                          **MARCH 19, 2025**

On April 14, 2022, Plaintiff Jared Jacobson filed a Complaint against Defendant the City of Philadelphia alleging he was subjected to race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq.  Specifically, Plaintiff claims he was denied a promotion to the role of Assistant Deputy Commissioner of Emergency Medical Services due to reverse race discrimination.  Presently before the Court is Defendant's Motion for Summary Judgement. (ECF No. 22.)  For the following reasons, Defendant's Motion will be denied.

**I.     FACTUAL BACKGROUND[1]**

**A.     Promotion Process**

In early 2021, Crystal Yates, the Assistant Deputy Commissioner ("ADC") for Emergency Medical Services ("EMS"), gave notice to Fire Commissioner Adam Thiel that she intended to retire in May 2021. (Pl. SOF Resp., ECF No. 23-2 ¶ 15.) Thiel then delegated the selection process for Yates' replacement to a committee consisting of Yates, Deputy Commissioner Craig Murphy, and Deputy Commissioner Tara Mohr (the "Executive Team"). (Pl. Ex. 3, Thiel Dep., ECF No. 22-5 at 26:11-20.) Although Thiel retained ultimate authority over the selection, the Executive Team played a major role in determining who would replace Yates.

---

[1] At summary judgment, courts view the evidence in the light most favorable to the non-moving party. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).

1

As part of succession planning, Yates offered a shadowing opportunity to a select group of employees, including Jacobson, who is white, and Martin McCall, who is African American. (Pl. SOF, ECF No. 23-3 ¶¶ 15, 20.) Yates also extended the opportunity to four other white Chiefs, all of whom declined to apply. (Pl. SOF Resp. ¶ 24.) Both McCall and Jacobson accepted the shadowing opportunity. Jacobson shadowed Yates on January 27, 2021, and McCall in February 2021. (Jacobson Dep., ECF No. 23-7, 54; Jacobson Affidavit, ECF No. 23-24, 2.)

The Department then posted the ADC role on April 28, 2021, and the job posting noted the following requirements:

> Candidates must be at the rank of [chief] or above and have direct EMS management experience. Candidates on the current FPSC promotional list are eligible to apply due to recent and anticipated retirements. However, the position will ultimately be filled by a[] [chief] or above.

(Pl. Ex. 5, ECF No. 23-10.) The posting also specified that the position was exempt from civil service regulations, and the posting noted education and training requirements including:

- Three years of senior operational leadership including oversight of community-based, front-line patient care administration … [; and]
- Management and/or supervisory experience, policy setting experience and budget/fiscal experience desired.

(*Id.*)

McCall and Jacobson applied for the position. McCall was promoted to the role of Chief on May 25, 2021, (Def. Ex. 8, ECF No. 22-10),[2] and McCall and Jacobson interviewed for the ADC position on May 26, 2021. (Pl. SOF Resp. ¶ 52.) The interviewer panel consisted of Dr. Crawford Mechem (Medical Director), Tara Mohr (Chief of Staff), Shonique McCall (ADC), and Danielle Sullivan (Human Resources). (Pl. SOF Resp. ¶ 56.) Yates provided the panelists with

---

[2] To be eligible for the role of Chief, McCall had to be on the promotional list, which ranks potential candidates based on exam results. When a position is open and available or a vacancy exists, the position is filled based on the ranked list. (Yates Dep., Def. Ex. 1, ECF No. 22-3 at 36:6-12.)

interview questions and instructed them to provide feedback in the form of a list of pros and cons for each candidate. (Pl. SOF Resp. ¶ 51.)

The interviewers submitted their lists of pros and cons to Murphy and Yates. (*See* Def. Exs. 11-14, ECF Nos. 22-(13-16).) Following the interviews, the record is unclear regarding what role various members of the Executive Team played in making a final recommendation to Thiel. Yates testified that she did not know why McCall was selected, that she "wasn't a part of the selection," and that she was informed of the selection by Murphy. (Yates Dep. at 41, 44-45.) Mohr testified that she was involved in providing pros and cons on the candidates but that she believed that "Chief Murphy and Chief Yates presented their choice to Commissioner Thiel." (Mohr Dep., Def. Ex. 6, ECF No. 22-8 at 31:4-11.) Murphy testified that the "[interview] panel recommended" a candidate and he "forwarded the result of those recommendations to Commissioner Thiel"; however, Murphy also testified that he recommended McCall to Commissioner Thiel. (Murphy Dep., Def. Ex. 7, ECF No. 22-9 at 32-34.) Commissioner Thiel testified that he delegated the selection process to Yates, who would consult with Murphy and Mohr, and Thiel further testified that Yates recommended McCall for the position. (Thiel Dep., Def. Ex. 3, ECF No. 22-5 at 26:14-20, 27:21-24.) Thiel also stated that "all of our decisions are team decisions, hence the term executive team. So we don't -- nobody makes an individual decision …" (*Id.* at 28:20-29-9.)

In explaining his recommendation of McCall, Murphy expressed concerns based on his perception of the panelist's assessment that Jacobson was not a "team player." (Murphy Dep. at 41:10-42:9.) Murphy conceded, however, that certain feedback from the interview panel (e.g., that McCall had a "tendency to silo himself" and "may tend to cut corners") suggested that McCall might also have difficulty acting as a "team player." (*Id.* at 52-53, 55-56.) Murphy also testified that neither candidate met the qualifications outlined in the job description for senior leadership,

3

noting that both candidates had worked below the level of leadership—Jacobson under Yates as Chief and McCall under a Deputy Chief of Logistics as Lieutenant. (*Id.* at 81-82.)

Thiel ultimately appointed McCall as the Assistant Deputy Commissioner for EMS. McCall was placed on the Executive Committee and assumed responsibilities in July 2021. (McCall Dep., Def. Ex. 9, ECF No. 22-11 at 7:8-7:12.)

### B.     Applicant Qualifications

Jacobson worked at the Philadelphia Fire Department since 2000, holding roles such as Paramedic and Lieutenant, and he also taught at the Fire Academy for three years. (Jacobson Resume, Pl. Ex. 20 at ECF No. 23-25.) Jacobson later served as Chief of EMS Administration, overseeing six units for nearly two years before applying for the ADC position. (*Id.*) In addition, Jacobson had field experience including participation in several community health projects. Jacobson held a B.A. in Psychology and master's degree in Homeland Security. (*Id.*)

McCall has worked at the Fire Department since 1998, initially serving as Fire Services Paramedic before advancing to the ranks of Lieutenant and Captain. (McCall Resume, Pl. Ex. 21, ECF No. 23-26.) McCall was promoted to Chief on May 25, 2021, serving in that role for approximately one month before being promoted to his current position as ADC in July 2021. (McCall Dep. at 7.) McCall's prior experience included overseeing two units. (*Id.* at 39.) Before joining the Fire Department, McCall worked as an emergency medical technician for several private ambulance companies. (Pl. SOF Resp. ¶ 41.) McCall's resume shows that he held a B.A. in emergency management and planning, a master's in public administration and a master's of law from the University of Pennsylvania, and was also a doctoral candidate in law and policy at Northeastern University. On September 26, 2016, McCall was suspended for forty-eight hours for a policy violation. (Pl. Ex. 16, ECF No. 23-21.)

## II.  LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party.  *Kaucher v. Cty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] factual dispute is material only if it might affect the outcome of the suit under governing law." *Id*.  The court must view the evidence in the light most favorable to the non-moving party. *Galena v. Leone*, 638 F.3d 186, 196 (3d Cir. 2011).

Where the nonmoving party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004).  If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c) ("A party asserting that a fact … is genuinely disputed must support the assertion by … citing to particular parts of materials in the record …"); *see also Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587 (citation omitted).

## III.  DISCUSSION

The City of Philadelphia moves for summary judgement arguing that Plaintiff has no evidence to rebut the City's legitimate nondiscriminatory reason for its hiring decisions and

therefore cannot establish that its reasons for not promoting Plaintiff was pretext for unlawful race discrimination.

To establish a prima facie case of reverse discrimination—"where a plaintiff cannot demonstrate membership in a protected minority—the plaintiff must instead address the first prong by presenting sufficient evidence 'to allow a fact finder to conclude that the employer is treating some people less favorably than others based upon a trait that is protected under Title VII.'" *Bond v. City of Bethlehem*, 505 F. App'x 163, 166 (3d Cir. 2012) (quoting *Iadimarco v. Runyon*, 190 F.3d 151, 161 (3d Cir.1999)).

If Plaintiff can establish a prima facie case, the burden shifts to Defendant, who must provide a legitimate, nondiscriminatory reason for its action. *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006). This burden is "relatively light," as the employer only needs to present evidence that, if accepted as true, would allow the conclusion that there is a nondiscriminatory reason for the unfavorable employment decision. *Id*.

Once the defendant has articulated a nondiscriminatory reason, the plaintiff must respond by citing evidence that the rationale is pretextual. *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir. 1994). The employee must point to evidence from which a reasonable factfinder could either: (1) disbelieve the employer's alleged nondiscriminatory reason or (2) believe an invidious discriminatory reason is more likely than not a motivating or determinative cause. *Id.* In other words, the plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' and hence infer" discrimination. *Id.* Where the plaintiff offers evidence that would allow "reasonable minds to conclude that the evidence of pretext is more credible than the employer's justifications, the

6

employer's motion for summary judgment must fail." *Id.* While this standard places a difficult burden on the plaintiff, "[i]t arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decision-making... ." *Id.* at 765.

### A.     Plaintiff Has Established a Prima Facie Case.

Defendant does not argue that Plaintiff failed to establish a prima facie case and therefore concedes this step of the burden-shifting analysis. (*See* Def. MSJ, ECF No. 22 at 3.)

### B.     Defendant Provided a Legitimate Non-Discriminatory Reason for Not Promoting Jacobson.

Defendant argues that Jacobson did not perform well during his interview, as evidenced by concerns noted by his interview panelists, which included "his inability to think outside the box, [and] his confrontational style and rigidity." (*See* Def. MSJ at 3, 8.) We find that the City has met its relatively light burden of providing a nondiscriminatory reason for its decision. *See Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (explaining that "this burden is 'relatively light' and is met if the defendant presents evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision").

### C.     Whether a Reasonable Factfinder Could Find Defendant's Stated Reasons Are Pretextual.

Once Defendant proffers a legitimate non-discriminatory reason, the burden shifts back to Defendant to show the reason is pretextual. Jacobson argues that there are six genuine issues of material fact from which a factfinder could infer that Defendant's stated reasons for not promoting Jacobson are pretextual. (Pl. Opp'n, ECF No. 23-4 at 16.)

#### 1.     *Relative qualifications of the candidates*

Jacobson argues that his qualifications were so superior to McCall's that a reasonable factfinder could discredit Defendant's proffered reasons for promoting McCall instead of Jacobson. (ECF No. 23-4, at 16-17.) When comparing the relative qualifications of candidates

for promotion, the Third Circuit has cautioned that more than a dispute must be shown to establish pretext. *Steele v. Pelmor Labs., Inc.*, 642 F. App'x 129, 135 (3d Cir. 2016) (internal citations omitted). Instead, a plaintiff must show that "qualifications of the person actually promoted or selected were so much lower than those of her competitors for a reasonable factfinder to disbelieve the claim the employer honestly sought the best qualified candidate." *Finizie v. McDonough*, No. 23-294, 2023 WL 5111973, at *7 (E.D. Pa. Aug. 9, 2023).

Here, Plaintiff has not shown the type of disparity in the relative qualifications between himself and McCall from which a reasonable factfinder could find pretext. Although McCall only served as chief for a day before his interview for ADC, his prior experience included managing a $4.5 million budget, a staff of both civilian and uniformed employees, a warehouse, multiple special event operations logistically and operationally, and nine years of frontline and clinical patient care. (Pl. SOF Resp. ¶ 45.) McCall also held a B.S. in emergency management and planning, a master's in public administration and a master's in law from the University of Pennsylvania, and was also a doctoral candidate at Northeastern University. (McCall Resume, Pl. Ex. 21.) In contrast, Jacobson held a bachelor's degree in psychology and a master's degree in Homeland Security. (Jacobson Resume, Pl. Ex. 20.) Moreover, interviewers noted a significant number of strengths and weaknesses for each candidate, and Murphy testified that neither candidate fully met the qualifications for senior leadership. (*See* Murphy Dep. at 82.)

In short, there is no evidence that Jacobson's qualifications were overall superior to those of McCall, much less that McCall's qualifications were "so much lower" that a reasonable factfinder could "disbelieve the claim the employer honestly sought the best qualified candidate." *See Finizie*, 2023 WL 5111973, at *7.

### 2. *Purported inconsistencies in assessment*

Jacobson argues that Murphy's assessment of the candidates was inconsistent and demonstrates pretext. (Pl. Opp'n at 16-17.) Murphy testified that he recommended McCall over Jacobson because, based on his review of the interviewer feedback, he was concerned that Jacobson "was not a team player." (Murphy Dep., Def. Ex. 7 at 42.) Plaintiff argues that this justification is inconsistent with the interviewer assessments, which he claims reflect concerns with McCall's ability to work on a team.

Murphy, who was instrumental in making a final recommendation to Thiel, claimed that a common theme among the interviewers was that Jacobson had difficulty working with others. (*Id.*) When pushed on this point, Murphy easily identified support from interviewer notes. (*See, e.g., id.* at 43-44.) That said, when Murphy was asked about interviewer comments that McCall had a "tendency to silo himself" and "may tend to cut corners," he conceded that these types of comments were the "exact opposite" of being a team player. (*Id.* at 53, 56.) Despite these concessions, Murphy was overall consistent in explaining that, while both candidates had a variety of strengths and weaknesses, he was more concerned with the drawbacks associated with Jacobson. (*See id.* at 43-44 (noting excerpts from feedback on Jacobson, including that he "can come off as confrontational," had expressed "anger and resentment" based on past experiences, and that he was "overly rigid").)

Murphy's reasoning therefore did not reflect the types of inconsistencies, incoherencies, or implausible statements from which a reasonable factfinder could find pretext.

### 3. *Failure to consider prior discipline*

Jacobson argues that, in assessing McCall's ability to manage, Defendant should have considered his suspension for a policy violation in 2016. (Pl. Opp'n, at 16, 19.) At least one

9

member of the interview panel was aware of the issue and referenced it in her assessment of McCall. (*See* Mohr Email, Def. Ex. 12 ("Concern about how field will view or respect him – both in terms of the lack of field experience but also other past history."); *see also* Pl. Ex. 6, Mohr Dep. at 25 (explaining that her comment referred to McCall's prior suspension).) Thiel, the ultimate decision-maker, was also aware of McCall's prior discipline. (Thiel Dep. at 52.) However, he claimed it was not his role to inquire about this information and that it would instead be the role of the Executive Team. (*Id.* at 52-53.)

Defendant claims that it selected McCall due to his performance in his interview, and the fact that McCall was suspended for 48 hours five years' prior does not undermine this rationale. At bottom, Plaintiff is asking the Court to weigh the relative qualifications of the candidates, which is a task for which the Court is ill-equipped. *See Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) ("[T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."). Failure to consider a suspension from 2016 during a promotion process in 2021 does not create the types of inconsistencies or implausibilities from which a reasonable factfinder could infer race discrimination.

### 4. *Timing of selection process*

Jacobson argues that the timing of promotional announcements, shadowing opportunities, and McCall's promotion to chief the day before the interview is suspicious. (Pl. Opp'n at 16, 19.) Jacobson suggests there are several issues in the timeline of events.

First, Jacobson notes that McCall began shadowing Yates in February 2021, which is before the opening for the ADC position was officially posted. (Jacobson Affidavit, ECF No. 23-24, 2.)

However, given that Jacobson had also already begun shadowing Yates at this point, this timing cannot serve as evidence of pretext.

Second, Plaintiff points to a posting from March 8, 2021, which shows there was an anticipated vacancy at that time regarding McCall's captain position. (*See* Pl. Ex. 24, ECF 23-29.) Although Plaintiff suggests that this posting indicates that McCall had essentially been pre-selected to the ADC position, Plaintiff overlooks that McCall was on the eligibility list for promotion to chief which would have led to a vacancy for his position regardless.

Third, Plaintiff notes that the Assistant Deputy Commissioner position was not posted until April 28, 2021. (*See* Pl. Ex. 4, ECF No. 23-9.) Plaintiff suggests that this time lapse shows that Defendant was dragging its feet "while waiting for McCall to become a Chief." (Pl. Opp'n at 9.) However, the undisputed facts show that Yates did not provide her official notice to Thiel until April 2021, which provides a legitimate alternative reason for the timing for the posting. (Pl. SOF Resp., ECF No. 23-2 ¶ 15.)

Fourth, Plaintiff notes that McCall had only held the role of chief for a day at the time of his interview for the ADC position. (Pl. Opp'n at 17.) Mohr testified that it was not unusual for a candidate to serve briefly as Chief before being allowed to interview for the position (Mohr Dep. at 35), and Yates explained that several individuals had been appointed to the Executive Committee from a rank below Chief. (Yates Dep. at 35.) Still, a reasonable factfinder could determine that the timing of McCall's promotion to chief (a day before the interview for the ADC position), in combination with other circumstantial evidence, suggests that the interview was a mere formality and thus discredit Defendant's proffered promotion rationale.

5.   *Involvement of various individuals in decision-making*

Jacobson argues that a lack of structure in the interview process and ambiguity as to decision-makers raises concerns about the integrity of the promotion procedure. (Pl. Opp'n at 16, 20.) Jacobson contends that, since the interview panel did not record, score, and rank the answers, "the interview was out of the ordinary[.]" (*Id.* at 20.) However, Jacobson does not point to any evidence that shows that this procedure diverged from standard policies, and Plaintiff's speculation does not provide a reasonable basis from which a factfinder could glean pretext. *See Preston v. The Vanguard Group, Inc.*, 2015 WL 7717296, at 11-2 (E.D. Pa. 2015) (granting summary judgment on discrimination claim where plaintiff had no evidence of discrimination other than her own subjective beliefs).

Jacobson also argues that there is a genuine issue of material fact regarding who made recommendations regarding who Commissioner Thiel should select. Thiel testified that he delegated the selection process to Yates, who in consultation with Murphy and Mohr recommended McCall for the position. (Thiel Dep. at 26-27.) Yates testified that she did not know why McCall was selected and that she "wasn't a part of the selection[.]" (Yates Dep. at 41, 44-45.) Murphy testified that the "[interview] panel recommended" a candidate and he "forwarded the result of those recommendations to Commissioner Thiel;" however, Murphy also testified that he recommended McCall to Commissioner Thiel. (Murphy Dep. at 32-34.)

Since the Court is unable to reconcile the deposition testimony regarding who was involved in the decision-making process, Plaintiff has established inconsistencies that could allow a reasonable factfinder to doubt Defendant's reasoning. *See Lugo v. Walmart, Inc.*, 616 F. Supp. 3d 451, 460 (E.D. Pa. 2022) ("The fact that none of Plaintiff's supervisors admits to making the decision to terminate Plaintiff is circumstantial evidence that would allow a factfinder to doubt

Walmart's proffered reasoning."); *see also Sabbrese v. Lowe's Home Ctrs., Inc.*, 320 F. Supp. 2d 311, 326 (W.D. Pa. 2004) (finding that plaintiff had demonstrated pretext when "no one … acknowledges making the ultimate decision to fire [the plaintiff]") (citing Fuentes, 32 F.3d at 765).

### 6. *Other purported evidence of racial animus*

Finally, Jacobson argues that the lack of white males on the Executive Committee and a statement by Darrell E. Clarke, Council President, at the budget meeting, serve as evidence of discrimination. (Pl. Opp'n at 17, 21.) Plaintiff's argument on this point falls short both factually and legally. Factually, it is undisputed that several of the decisionmakers, including Commissioner Thiel, are white. (Pl. SOF Response at 56.) Legally, a reasonable factfinder could not infer a decision was racially motivated merely because some decisionmakers were not white males. *See Coulton v. Univ. of Pennsylvania*, 237 F. App'x 741, 748 (3d Cir. 2007) ("The mere fact that [the adverse decision-makers] were of a different race than [the employee], however, is insufficient to permit an inference of discrimination.") (citations omitted).

Furthermore, Plaintiff's reference to a councilmember's speech regarding diversity efforts is far too attenuated from the promotion process at issue, and no reasonable factfinder would doubt Defendant's proffered reason on this basis. *See Musa v. Soar Corp.*, No. 13-2847, 2014 WL 6809019, at *18 (E.D. Pa. Dec. 1, 2014) (noting that the mere existence of a diversity policy does not constitute evidence of discrimination under Title VII).

### IV. <u>CONCLUSION</u>

Although Defendant's motion for summary judgment presents a close call, contradictions regarding who was involved in decision-making coupled with the timing of interviews the day after McCall became chief could permit a reasonable factfinder to doubt Defendant's proffered

13

rationale and infer discrimination.  Defendant's motion will therefore be denied.  An appropriate order will follow.

                                            **BY THE COURT:**

                                            *R. Barclay Surrick*
                                            **R. BARCLAY SURRICK, J.**